In consequence, I find no merit in petitioner's grounds and will dismiss the action.

In the Matter of **READING COMPANY, Debtor.**

**Re: Trustees' Petition for Approval of Memorandum of Understanding for SEPTA's Operation of Debtor's Passenger Service.**

No. 71–828.

United States District Court,
E. D. Pennsylvania.

June 7, 1973.

**1352**

Lockwood W. Fogg, Jr., Philadelphia, Pa., for Reading Co., Debtor.

Obermayer, Rebmann, Maxwell & Hippel by Herbert A. Fogel, Philadelphia, Pa., for Trustees Richardson Dilworth and Andrew L. Lewis, Jr.

Cadwalader, Wickersham & Taft by William J. Moss, Daniel T. Brooks, New York City, for Institutional Investers Reading Group.

Kelley, Drye, Warren, Clark, Carr & Ellis by Edward Roberts, III, and H. Thomas Davis, New York City, for Manufacturers Hanover Trust Co., as Indenture Trustee.

James F. Dausch, U. S. Dept. of Justice, Washington, D. C., for the U. S.

Richter, Syken & Ross by Kenneth Steen, Robert M. Ross, Philadelphia, Pa., for Leo Ward and Charles Stricker.

Ballard, Spahr, Andrews & Ingersoll by Charles I. Thompson, Jr., Philadelphia, Pa., for The North Pennsylvania Railroad Co., Philadelphia, Germantown & Norristown Railroad Co.

Meyer, Lasch & Hankin & Poul by Herman B. Poul, Philadelphia, Pa., for System Federation # 109.

Kleinbard, Bell & Brecker by George A. Burnstein, Philadelphia, Pa., for Brotherhood of Maintenance of Way Employees and Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees.

Mulholland, Hickey & Lyman by Geoffrey N. Zeh, Washington, D. C., for Railway Labor Executives' Association

## OPINION AND ORDER NO. 414

DITTER, District Judge.

The Reading Company, a bankrupt railroad, has consistently lost money on commuter operations since 1945. By the petition now before the Court, the railroad's trustees have submitted for approval the broad outlines of a plan by which a public authority would assume responsibility for the passenger services and the railroad would turn over to the authority certain valuable properties.

The principal features of the arrangement negotiated between the Trustees and Southeastern Pennsylvania Transportation Authority (SEPTA) [1] are set

---

1. SEPTA is a Pennsylvania public authority established under the provisions of the Metropolitan Transportation Authorities Act of 1963, 66 P.S. §§ 2001 et seq. Its board members represent the Commonwealth of Pennsylvania, City of Philadelphia, and Counties of Bucks, Chester, Delaware and Montgomery. SEPTA has no taxing power and, hence, no independent source of funds other than the fare box. Its financing of the rail commuter support program is dependent upon annual appropriations of funds from the City of Philadelphia and the four suburban counties, matched on a two-to-one ratio by the Commonwealth of Pennsylvania.

forth in a Memorandum of Understanding. Its approval is opposed by the Institutional Investors Reading Group (bondholders); the trustee of the debtor's mortgage; the North Pennsylvania Railroad Company (North Penn) and the Philadelphia, Germantown and Norristown Railroad Company (PG & N), two companies whose lines and properties are leased to the Reading; and by three labor organizations representing debtor's employees.

In reaching any decision on whether this Court should give its approval to this agreement, the possible alternatives available to the Reading must be examined.

## BACKGROUND

The debtor operates 1,138 miles of railroad of which 213 miles carry the passenger operations to be taken over by SEPTA. Of these 213 miles, 112 are owned by the Reading. The remaining 101 miles are parts of lines which the Reading uses under long-term leases from the North Penn and the PG & N railroads.[2] The passenger portion of the Reading is a vital link in the overall transportation system in the Delaware Valley, carrying approximately 50,000 persons each weekday. This service has operated at a substantial loss every year since 1945, even though public support payments have been made since 1960. When figured on a percentage basis, the passenger deficit for 1971 (before subsidy payments) of $8.9 million is about 93% of the passenger revenue, $9.6 million. In comparison, the freight loss, $7.4 million for the same year, is about 7.6% of total freight revenue, $96.6 million. This leads to an almost unescapable conclusion that there is no hope to make the passenger business profitable, but that the freight business might well become solvent.

What are the viable alternatives open to the Reading Company?

## I. LIQUIDATION

Liquidation is a drastic step and should be considered only as a last resort. This railroad's passenger service is made up of more than 13 million individual trips each year. The Reading's freight business generates in excess of $93 million a year. Over 5,600 persons are employed by the Reading Company, with a payroll in excess of $72 million. The economic and social importance of the debtor's freight and passenger service warrants the expenditure of every effort to maintain their operation. Certainly, liquidation would not be proper now. Section 77 of the Bankruptcy Act requires a balancing of interests of the creditors of a railroad on the one hand, and the interest of the public on the other. The Trustees are "thus charged with the dual responsibility of conserving the debtor's estate for the benefit of creditors and preserving an ongoing railroad in the public interest." New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). Liquidation is not called for until the futility of every reasonable effort to put the debtor into a sound financial condition becomes apparent.

## II. GOVERNMENTAL AID

At first blush, government grants and loans might seem to offer hope for the Reading. There has been a great deal of discussion about the possibility that the Federal Government may subsidize or take over the seven bankrupt railroads of the northeast. Two

---

2. The passenger portions of the two leased railroads, to be subleased to SEPTA, include all the property of the North Penn and PG & N used for passenger service and all property adjacent to the lines over which passenger service is operated. Of the North Penn, 81 out of 95 total miles of railroad will be subleased (85%); of the PG & N, 20 out of 29 total miles of railroad will be subleased (68%). SEPTA is expected to bear the portions of rents payable for these two lines equivalent to the ratio of miles of railroad to be leased to total miles of railroad (i. e. 85% and 68%).

concrete proposals have been made, one by the Interstate Commerce Commission and one by the Department of Transportation. However, at present these are only proposals. Neither has been approved, and no funds have been appropriated. It is impossible for the Reading to pay its bills with proposals. To wait until some unknown date in the future for a suggestion to solidify into Congressional legislation would be irresponsible. Even if the Federal Government does act, it may provide nothing for the Reading.[3]

### III. ABANDON THE PASSENGER SERVICE

■ Terminating commuter operations, like liquidation, would be a drastic step. The Delaware Valley would indeed be paying a heavy price for the attempts to save the Reading. There is certainly no consideration of the public interest in this alternative. From the standpoint of the effect on the Reading's cash position, abandonment becomes even more untenable. Included in the present operating agreement with SEPTA is a provision that subsidies will immediately cease if the Reading attempts to abandon its passenger service. The time required for a final administrative decision would be a *minimum* of eight months. This would consist of four months before the Pennsylvania Public Utilities Commission and at least four months before the Interstate Commerce Commission.[4] This eight month period would probably become more like 18

months when inevitable appeals are considered. The cash drain for the minimum eight month period would be two-thirds of the annual SEPTA subsidy, or $4.34 million. Reading's current cash balance of $6 million would be insufficient to withstand the period of crisis. If the time period were more than eight months (which is quite likely) any hope of reorganizing the debtor would be shattered. Thus, abandonment of the passenger service is not a viable alternative.[5]

### IV. NEGOTIATIONS WITH SEPTA

Basically, the Memorandum of Understanding sets the stage for further action by the parties with respect to (1) a long term lease to SEPTA of a portion of debtor's property; (2) possible modification of the North Penn and PG & N leases; (3) an agreement for the debtor to operate the passenger service as SEPTA's agent; (4) procurement by SEPTA of a continuing source of funds; (5) numerous other agreements to meet the problems of implementing the Memorandum; and (6) applications to regulatory agencies for authority for Reading to discontinue its passenger service. The benefits which the debtor would derive from the implementation of the Memorandum fall into four general categories.

A. First, the action to be taken by the debtor to eliminate its legal obligation to continue the financially oppressive commuter operations will not be

3. Although there has been a lot of talk about the Federal Government helping the troubled railroads, there have not even been whispers that the Commonwealth of Pennsylvania would provide any aid.

4. In the event that a railroad should require authority to terminate its passenger service, the proper agencies would be the Pennsylvania Public Utility Commission, 66 P.S. § 1122 and the Interstate Commerce Commission, 49 U.S.C. §§ 13a(1) and 13a(2).

5. It has been argued that this court can order abandonment of the passenger service *without prior approval* of any regulatory agency. This contention is based on the recent decision In re Central

Railroad Company of New Jersey, 485 F.2d 208 (3rd Cir. March 7, 1973), which approved a termination of service order without prior ICC approval. However, a petition for rehearing in light of Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939) has recently been granted. Thus, the law in this area is still unsettled. Traditionally, prior agency authority has been required. See, e. g. In re Fonda, J. & G. R. Co., 95 F.2d 397, 399 (2nd Cir. 1938); In re New York S. & W. R. Co., 160 F.2d 29, 32 (3rd Cir. 1947); Commonwealth of Massachusetts v. Bartlett, 384 F.2d 819, 821 (1st Cir. 1967); In re Boston & Maine Corp., 455 F.2d 1205, 1208 (1st Cir. 1972).

impeded by SEPTA, the Commonwealth, or other political entities which traditionally play an active part in obstructing efforts to terminate passenger service. Rather, SEPTA will support Reading's applications. This would greatly reduce the necessary time for approval, and would also eliminate the possibility of a cash crisis while these applications are pending.

B. Secondly, future losses calculated on the basis of avoidable costs,[6] from the operation of passenger services, currently around $7.1 million[7] a year, would be eliminated if SEPTA takes over under the Memorandum.

C. Thirdly, future capital expenditures related to the passenger service would be eliminated. Anyone who rides the Reading would quickly agree that such purchases are long overdue. Although the magnitude of any outlays is uncertain, their eventual necessity is not. Any such payments which are required would tend to deplete the available cash. The problems this might cause have already been discussed. Under the Memorandum, SEPTA would have complete responsibility for any capital expenditures.

D. Finally, SEPTA will assume the full costs of the lines of railroad over which the passenger service will be operated (see B, above). This will provide, at *no cost* to the Reading, tracks and facilities for the operation of freight service over the lines to be acquired by SEPTA. Since track must be maintained at a higher level for passenger service as opposed to freight service (for safety purposes) the level of maintenance provided by SEPTA will be satisfactory.[8]

These benefits must be viewed in the ultimate light of a reorganization plan. All discussions on ways of restructuring the Reading to make its freight handling portions attractive for acquisition by other railroads, or of obtaining efficiencies to make it more competitive, have assumed the permanent relief from passenger responsibilities. The continuation of Reading's freight service is of particular significance to other railroads since about 86% of debtor's freight traffic moves from or to other rail lines rather than originating and terminating on debtor's tracks. The useful portions of Reading's freight facilities could be transferred for value. The value so received, together with other of debtor's assets could then put it in a position to earn net income as a base for reorganization. There have been discussions along these lines with two major railroads, the C & O and the Norfolk & Western. However, all of these talks have been based on the assumption that passenger responsibilities would be eliminated.

The opponents of the Memorandum raise many arguments.[9] However, when

---

6. The method of calculating avoidable passenger costs, used by Reading and SEPTA, has been in use since 1964 as the basis for figuring subsidy payments. The procedure is a determination of those dollars which would not be spent if passenger service were no longer operated and those dollars which would not be collected under the same circumstances.

7. This figure of $7.1 million a year is before any subsidy payments. Even with support payments of $5.7 million in 1972, the net deficit was $1.4 million. Contemplated wage increases under existing contracts will increase this deficit by $500,000 to $750,000 per year. Inflationary effects on costs of materials and supplies could increase these losses even more.

8. The expense of maintaining this track, and correspondingly the benefit to the Reading, will be greatly increased when there is full implementation of the standards required by the Federal Railroad Administration, because SEPTA will bear these additional costs.

9. One of the principal arguments raised by the bondholders and the trustees of the railroad's mortgage is that the value which the Reading Trustees place on the assets to be transferred to SEPTA is too low. On the other hand, the Reading argues that the value which these groups place on the assets is too high. I make no decision at this time as to the proper method for valuing the assets of the Reading. This can await submission of a final agreement for Court approval.

considered in light of two very basic principles, all of these contentions fall.

First, when the alternatives are considered, trying to implement the Memorandum of Understanding is the only path that the Reading can realistically follow. Section 77 of the Bankruptcy Act mandates reorganization if possible, and in my opinion, that possibility still exists if the Reading is relieved of the debilitating passenger service.

Second, the authority presently sought is for approval of the Memorandum of Understanding only to the extent required in order that the Trustees may negotiate the many matters necessary to reach definitive agreements. Any that are concluded must be approved by this Court, and no property rights will pass from the Trustees to SEPTA until further order.

The Trustees and SEPTA should proceed with their negotiations within the framework of the provisions of the Memorandum. Those parties with objections should keep in mind that all agreements must be approved by this Court, and that all objections can be raised at a future time.