OPINION OF THE COURT
ADAMS, Circuit Judge.
In this appeal, we consider the authority of a district court, sitting as a reorganization court, to permit interim operation of a debtor’s rail service by a party that has applied for, but not yet received, final approval from the Interstate Commerce Commission (ICC) to purchase the debtor railroad. We determine that such authority is provided for in the Milwaukee Railroad Restructuring Act of 1979 (MRRA), but not in the general provisions of the Bankruptcy Act. We conclude, however, that because the district court in this case did not approve, on a preliminary basis, the sale of the rail line in question to the party subsequently appointed as interim operator, the procedural requirements set forth by the MRRA were not followed. Accordingly, the order of the district court awarding interim operating rights to appellee Morris-town & Erie Railway, Inc., will be vacated and this matter remanded for further proceedings.
I
The Morristown & Erie Railroad Company (hereafter “Morristown Railroad” or “Railroad”)[1] has been in reorganization proceedings under section 77 of the Bankruptcy Act[2] since October 1977. The Railroad, which serves as a freight carrier and has nine employees, consists of about eleven miles of track in Morris County, New Jersey. In January 1978, the district court appointed a trustee to oversee the reorganization process and to operate the Railroad on an interim basis.
Two groups presently are seeking final approval from the ICC to purchase the assets of the Morristown Railroad line: the Mandelbaum party (appellant here) and the Ward party (appellee here, also known as the Morristown & Erie Railway, Inc.). Both groups have submitted proposed plans of reorganization to the ICC pursuant to section 17(b)(2) of the MRRA (45 U.S.C. § 915(b)(2)). As of this date, neither proposed plan has been approved by the ICC.
In November 1981, the trustee for the Railroad petitioned the district court for permission to enter into an agreement whereby Ward would operate the Railroad on an interim basis, pending final ICC endorsement of either the Ward or Mandelbaum applications. Mandelbaum objected to such an arrangement, and subsequently requested that the district court instead designate it as interim operator of the Morris-town Railroad line. The district court initially denied both requests. Upon reconsideration, however, after conducting a hearing and entertaining a number of affidavits, the district court approved the trustee’s petition and authorized Ward to serve as the Railroad’s temporary operator.
Under the terms of the Interim Operating Plan approved by the district court, Ward is given a full (but defeasible) right “to occupy, possess and operate, all of the M&E assets contemplated to be transferred pursuant to [the reorganization plan submitted by Ward to the ICC].” Ward is entitled to receive all revenues and is required to assume all liabilities arising out of its use of the Morristown Railroad assets. The Plan calls for the payment of a $10,000 monthly “fee” by Ward to the trustee. These payments are non-refundable should an applicant other than Ward secure final ICC approval to purchase the rail line; in *362 the event, however, that Ward is successful before the ICC, any amounts previously paid by Ward in rentals are to be credited toward its overall purchase price of the Railroad. Appendix at 10-20.
In approving the trustee’s proposal for interim operation of the Morristown Railroad facilities by Ward, the district court found that such an arrangement would be
of considerable benefit to both the Estate —i.e., the creditors — and to the Morris-town & Erie Railroad itself. Such an Agreement will insulate the Estate from risk of operating loss while providing some income from accrual of interest. In addition, the Trustee will be freed of the burden of running the railroad, while individuals better qualified in the day-today operation of the railroad will be enabled to assume those responsibilities.
The district judge apparently designated Ward as interim operator on the basis of the trustee’s recommendation that selection of that applicant would “plainly benefit the estate,” in view of the expertise of one member of the Ward group in the operation of the Morristown Railroad. In this connection, the court specifically found that “[a]s between the two proposed Operating Agreements,” Ward, “by virtue of [its] greater general experience and particular familiarity with the Morristown & Erie Railroad, [is] best suited to the task of operating the railroad on an interim basis.” The district court stressed, however, that “this Court is not to be understood as taking a position with regard to the relative merits of the two competing Plans of Reorganization currently under consideration by the Interstate Commerce Commission ” (emphasis added). Accordingly, the interim operators were instructed to vacate the property and relinquish control of the Railroad at the end of the interim period if the Ward plan is ultimately rejected by the ICC. Appendix at 1-2.
The district court’s order awarding interim operating rights to the Ward group was filed on December 23, 1981. Shortly thereafter, counsel for Mandelbaum challenged the legal authority of the district court to permit interim operation of a railroad by a person or entity other than a court-appointed trustee. When the district court declined to reconsider its decision, the present appeal was filed. We directed that the case be considered on an expedited basis.
II
This appeal turns on the power of the district court to authorize an interim operating agreement between a debtor railroad and a third party. Although the district court did not set forth a legal rationale to justify its decision to appoint Ward as interim operator of the Morristown Railroad, appellees point to two possible sources of statutory authority upon which that court could have drawn: section 17(b)(3) of the MRRA, and section 77 of the Bankruptcy Act. We proceed to consider each of these statutes separately.
A
The MRRA was enacted in 1979 in response to the threatened collapse of the Chicago, Milwaukee, St. Paul and Pacific Railroad, an extensive rail system that primarily serves the upper midwest section of the country. The legislation was intended to prevent the possibility of a rail stoppage on that line because of the carrier’s bankruptcy. Although virtually the entire statute deals with the restructuring of the Milwaukee Railroad (see 45 U.S.C. §§ 901-922), section 17 (45 U.S.C. § 915) applies generally to all railroads undergoing reorganization proceedings.
Section 17(a) of the Act deals with the treatment by a bankruptcy court of abandoned rail lines. Inasmuch as no line of the Morristown Railroad has been abandoned, section 17(a) is not applicable here. Rather, section 17(b), which deals with the “[s]ale or transfer of lines of railroad under [the] Bankruptcy Act,” is the central focus of this dispute.
Section 17(b)(1) stipulates that, notwithstanding any other provision of law, a bankruptcy court may authorize “the sale or transfer” of a rail line subject to the approval of the ICC under section 17(bX2). *363 Section 17(b)(2) specifies that a court “may not authorize [such] a sale or transfer” unless the party seeking to purchase has submitted “an appropriate application with respect to such sale or transfer” to the ICC. The ICC has, at a maximum, 180 days during which it is to determine whether the application should be approved, modified, conditioned, or rejected. Prior to the passage of the MRRA, and specifically the enactment of section 17(b)(2), no time limitation was imposed on the deliberations of the ICC. One purpose of section 17(b)(2), therefore, was “to require the Commission to give preference to sales or transfers of lines of a railroad in reorganization,” and thereby facilitate one of Congress’ goals in enacting the MRRA, namely, the prevention of disruption to the economy resulting from the discontinuation of service by financially troubled railroads. House Conference Rep. No. 96-583, 96th Cong., 1st Sess. reprinted in [1979] U.S.Code Cong. & Ad. News 1742, 1759 (emphasis added).
Section 17(b)(3) provides for the possibility of the operation of a railroad undergoing reorganization between the time that an application is submitted to the ICC and the time the ICC acts on such an application:
Pending review of an application by the Commission pursuant to [section 17(b)(2)], the court described in [section 17(b)(1) ] may, on a preliminary basis, authorize the sale or transfer proposed in such application. The court may permit the purchasing carrier to operate interim service over the lines to be purchased, and in operating such service it shall use employees of the carrier subject to the bankruptcy proceeding to the extent such purchasing carrier deems necessary for the operation of such service.
The appellees urge that section 17(b)(3) be read to authorize a district court to appoint as interim operator of a railroad a party whose application for purchase of that line is currently pending before the ICC. While we generally agree with such an interpretation of section 17(b)(3), we conclude that, in awarding interim rights to Ward in this case, the district court did not comply with the requirements of that provision.
The first sentence of section 17(b)(3) permits a district court to authorize, on a “preliminary basis,” the sale or transfer of railroad lines to a party whose application for purchase is currently “pending review” before the ICC. The justification for a legal transaction of this sort can be discerned from the previous subsections of section 17(b): the purpose of the Milwaukee Act is to prevent interruptions in railroad service; toward this end, the ICC is obliged to rule on the merits of a prospective purchaser’s application within 180 days; and, in the meantime, a court can designate that prospective purchaser as purchaser-on-a-preliminary-basis, in order to allow for the interim operation of the rail line. It is at this point that the second sentence of section 17(b)(3) becomes relevant: “The court may permit the purchasing carrier to operate interim service over the lines to be purchased. ... ” With respect to the italicized phrase, it is important to realize that the statute does not authorize the provision of interim operating services by “a carrier” or “any carrier.” Rather, it specifically provides that such operation must be conducted by the “purchasing” carrier — i.e., the party seeking to purchase the rail line in question. Nor does section 17(b)(3) speak in terms of “a purchasing carrier.” Were this the case, it could plausibly be argued that any party with an application pending before the ICC could be entitled to provide interim services, by reason of being a potential purchasing carrier. Whatever the appeal of such an interpretation, however, the fact is that Congress explicitly provided that a to-be-reorganized railroad could be operated on an interim basis only by “the purchasing carrier.” Reading this portion of section 17(b)(3) in conjunction with the statute’s previous sentence, we are persuaded that only a specific purchasing carrier — namely, that carrier authorized by the district court, on “a preliminary basis,” to purchase the railroad’s assets — may be assigned the task of operating the railroad pending a final decision by the ICC. To put it another way, we believe that section 17(b)(3) requires preliminary approval by *364 the reorganization court of a proposed purchase as a condition precedent to the authorization of interim service.
The justification for such an interpretation of section 17(b)(3) can readily be understood by considering the difficulty that might arise were a district court to permit interim operation of a railroad by a party that had not received preliminary approval by the court to purchase the line. When a railroad encounters financial hardship, and is obliged to undergo reorganization, one important objective, at least according to the congressional findings that accompany the MRRA, see 45 U.S.C. § 901, should be the continued operation of vital rail services. Obviously it would be detrimental to the public interest were a railroad forced to suspend operations between the time it filed for reorganization and the time the ICC ultimately approved its sale to the purchasing carrier. By the same token, however, it may be unfair to the debtor-railroad’s creditors to be forced to continue a losing venture, simply in order to serve the public — especially when a willing purchaser is able and prepared to intervene. See In re Chicago, Milwaukee, St. Paul and Pacific Railroad Co., 611 F.2d 662, 666 (7th Cir. 1979). Under such circumstances, it would seem desirable for the reorganization court to be empowered to authorize the willing purchaser to operate the line on an interim basis — and indeed, the MRRA vests the district court with precisely this authority. At the same time, however, the public interest in the continuity of rail services might not be served were the district court to select an interim operator from among a number of applicants without considering their relative strengths and deficiencies as potential purchasers of the railroad. It might be disruptive were an interim operator to take over from the debtor railroad, operate the facilities for a number of months, and then be displaced by the party eventually approved as final operator by the ICC. In the event that more than one party is competing for the purchase of a rail line, therefore — as is the case with respect to the Morristown Railroad venture — it appears that Congress contemplated that the most efficient course would be for the district court to identify the best proposed purchaser and select that party to undertake interim operations, in the hope of achieving overall operating continuity.[3] We believe that Congress envisioned such a procedural approach on the part of a district court when it directed that, before a party be permitted to conduct interim operations of a bankrupt railroad, the “sale or transfer proposed” in that party’s application to the ICC be approved by the court “on a preliminary basis.”
In this case, however, the district court did not follow the procedural course set forth in section 17(b)(3). Rather, the court designated one of the two groups competing for permanent purchase of the Morristown Railroad line as interim carrier without authorizing a sale or transfer to that party on a preliminary basis.[4] Appellees suggest that the district court did authorize a preliminary transfer of the Morristown Railroad assets “by its very act of approving the interim operating agree *365 ment.” Brief for Appellee Morristown & Erie Railway, Inc. at 20. The district judge, however, explicitly disclaimed any notion either of selecting the “better” of the two competing parties or of proceeding with preliminary authorization of a sale of thé Railroad. The court pointedly observed that it was “not to be understood as taking a position with regard to the relative merits” of the two plans under examination by the ICC. In view of this specific disclaimer, we are unable to construe the order of the district court as “in effect” an order that awarded preliminary purchase rights to the Ward group. Rather, we must conclude that, in approving the trustee’s request to permit Ward to operate the Railroad on an interim basis, the district court deviated from the commands of the statute, for it did not authorize, on a preliminary basis, the sale of the Railroad to Ward. As a result, Ward cannot be considered “the purchasing carrier” under section 17(b)(3) of the MRRA, and thus cannot be permitted to provide temporary service on the Morris-town Railroad route.
Although we accept Mandelbaum’s argument that preliminary authorization of a sale is a condition precedent to the designation of a party as an interim carrier, we cannot agree with an additional position advanced by the appellant: namely, that section 17(b)(3) prohibits interim operation of a railroad by an entity other than a rail carrier. In essence, Mandelbaum contends that section 17(b)(3) of the MRRA must be read in conjunction with section 5(b)(3) of the Act. This latter provision governs the reorganization and interim operation of only one rail system — the Milwaukee Railroad. It provides, in relevant part:
Pending review of an application by the [ICC] pursuant to [section 5(b)(2)], the bankruptcy court may, on a preliminary basis, authorize the sale or transfer of lines of the Milwaukee Railroad to another rail carrier. The court may permit the purchasing carrier to operate interim service as a common carrier over the lines to be purchased, without regard to section 10901 of Title 49.
45 U.S.C. § 904(b)(3) (emphasis added). Under the terms of this provision, it would appear that only another railroad would be able to operate the Milwaukee Railroad on an interim basis, because only a “rail carrier” is authorized under the Act to purchase the Milwaukee line.[5]
Mandelbaum urges that the “rail carrier” limitation of section 5(b)(3) be imputed into the more general language of section 17(b)(3) for two reasons. First, Mandelbaum insists that the MRRA, like any other statute, must be interpreted and construed as a whole; in this effort, a reviewing court should attempt to harmonize a statute’s various sections, thereby eliminating any inconsistencies that arguably might be traced to mere imprecision in drafting. It would make little sense, appellant suggests, for Congress to have created a situation wherein an interim operator on the Milwaukee line, but not necessarily on other rail lines, is required to be a rail carrier. Second, Mandelbaum contends that if sections 5(b)(3) and 17(b)(3) are not read in tandem, section 5(b)(3) would be unconstitutional as a non-uniform bankruptcy law, because there would be one reorganization procedure applicable for all railroads in the country except the Milwaukee.[6] Mandelb *366 aum asks this Court to read sections 5 and 17 consistently, so as to ensure the constitutionality of the MRRA.
With respect to the overall construction of the MRRA, we cannot accept Mandelbaum’s assertion that, in order to harmonize sections 5 and 17, it is necessary to hold that only an established rail carrier is eligible to operate interim service on a line such as the Morristown Railroad. Quite simply, section 17(bX3), unlike section 5(b)(3), imposes no such limitation on the discretion a reorganization court enjoys in selecting a temporary operator. Given the absence of congressional direction on this point, we see no reason to read such a requirement into the statute. We note that in the original House version of section 17(b)(3), the phrase “to another rail carrier” was included. See 125 Cong.Rec. H9936 (daily ed. Oct. 30, 1979). Appellant, in effect, asks us to ignore the fact that, during legislative consideration of the MRRA, Congress specifically removed this language from section 17(b)(3) while retaining it in section 5(b)(3). Mandelbaum’s attempt to dismiss this revision as a mere “clarifying” change is unconvincing. Moreover, the enacted version of section 5(b)(3) contains two additional expressions not present in section 17(b)(3). Under section 5(b)(3), a district court is authorized to permit the purchasing carrier to operate interim service “as a common carrier” over the lines of the Milwaukee Railroad to be purchased. This phrase, which does not appear in section 17(b)(3), can be read as congressional emphasis on the previously expressed requirement that a railroad, as opposed to a non-carrier party, be given interim powers with respect to the Milwaukee roads. Additionally, section 5(b)(3) provides that interim service may be authorized “without regard to section 10901 of Title 49 [of the United States Code].” This latter statute, among other things, directs the ICC to consider the effects on competition resulting from an agglomeration of existing carriers. While Congress appears to have been willing to forego concerns about competition in order to revitalize the Milwaukee Railroad, a similar concession was not included as part of the rules applicable to the reorganization of other rail systems. In short, we are persuaded that sections 5(b)(3) and 17(b)(3) represent somewhat contrasting approaches to different problems, and that therefore the two clauses need not be read identically. Congress envisioned the class of potential rescuers of the Milwaukee Railroad quite narrowly (viz, only established rail carriers), yet, at the same time, authorized a broad range of parties (including non-carriers) to serve as interim operators (and, ultimately, purchasers) of other endangered lines such as the Morristown Railroad.
We need not belabor our response to Mandelbaum’s constitutional argument about the potential non-uniformity of section 5(b)(3) under the Bankruptcy Clause. Regardless whether section 5(b)(3) ultimately is determined to be a non-uniform bankruptcy law,[7] it is section 17(b)(3) of the MRRA, and only section 17(b)(3), that is at issue on this appeal. Section 17(b)(3) clearly is a uniform bankruptcy law — assuming that it is, in fact, a bankruptcy law[8] — because it applies to all railroads in the country undergoing reorganization, save the Milwaukee. We decline to alter our interpretation of section 17(b)(3) simply to remove constitutional doubts about a provision not even implicated in the present controversy.
*367 To summarize: A reorganization court has the authority under section 17(b)(3) of the MRRA to appoint a party, which need not be an existing rail carrier, to operate the debtor’s rail services on an interim basis. In exercising this authority, however, the court is obliged to follow the procedural requirements set forth in MRRA. In this case, however, the district court did not authorize, on a preliminary basis, the sale of the Morristown Railroad assets to Ward before permitting that group to assume interim-operator status.
B
Appellees argue that, irrespective of the MRRA, the district judge had the authority under section 77 of the former Bankruptcy Act, 11 U.S.C. § 205 (repealed 1978), to relieve the trustee of interim operating responsibilities for the Morristown Railroad. Section 77(c)(2) provided, in part, that a trustee for a railroad undergoing reorganization possessed, among other things, “the power to operate the business of the debtor,” subject to the approval and supervision of the district court. Elaborating upon this grant of authority, Bankruptcy Rule 8-207 stated that
[sjubject to the jurisdiction of the Interstate Commerce Commission, the trustee, receiver, or the debtor, if the trustee or receiver has not qualified, shall conduct the business and manage the property of the debtor for such time and on such conditions as may be in the best interest of the estate and in the interest of continuing the debtor’s rail operations.
Appellees contend that the trustee’s leasing of the Railroad to Ward was clearly in the best interest of the estate, as the district court so found; that the trustee, as possessor of an “absolute” title to the property under reorganization, see 4A Collier on Bankruptcy § 70.04 at 50.1 (14th ed. 1978), had the right under Rule 8-207 and general bankruptcy principles to enter into a lease arrangement with respect to some or all of the property under his administration; and that in entering into this arrangement, neither the trustee nor the reorganization court abrogated its responsibility to retain control over the property of the estate.
We need not decide whether, prior to the enactment of the MRRA, a district court, presiding over the reorganization of a railroad, had the authority under section 77 and Rule 8-207 to permit an applicant for purchase of a rail line to operate that line on an interim basis pending ICC review.[9] For we are persuaded that the sole statutory power currently available to a district court with respect to the precise transaction in question is to be found in section 17 of the MRRA. We reach this conclusion for three reasons.
First, the terms of section 17(b) itself preclude resort to general bankruptcy-law principles in arranging interim service by parties other than the trustee for railroads undergoing reorganization. The procedural requirements set forth in section 17(b) were deemed applicable by Congress “[njotwithstanding any other provision of law, in any case pending under section 77 of the Bankruptcy Act on the date of enactment of this Act.” 45 U.S.C. § 915(b)(1). In the face of this language, it would be anomalous for a court to hold that, even though the standards announced in the relevant section of the MRRA had not been complied with, this problem could be “cured” by resort to a less specific and more tangential statutory scheme. Second, the legislative history of the MRRA suggests that Congress recognized that, prior to the effective date of that Act, a bankruptcy court had no power to authorize an interim-operating arrangement involving non-trustees. The confer *368 ence committee responsible for the final version of the MRRA incorporated that portion of the Senate bill that rendered sections 5 and 17 of the Act inapplicable with respect to any petition for purchase of a railroad filed with the ICC prior to November 1,1979. In explaining this addition, the conferees noted that “[f]or applications filed prior to November 1, 1979, the Bankruptcy Court shall have no power to grant interim operating authority.” House Conference Rep.No.96-583, supra, U.S.Code Cong. & Ad.News at 1759. From this discussion, we conclude that, in enacting the MRRA, Congress understood that no authority to arrange for temporary operation of a debtor-railroad’s services by a potential purchaser of the railroad existed prior to the Act, and that further legislative action, in the form of the MRRA, was necessary in order to so authorize district courts with respect to post-November 1979 applications. Finally, as a matter of classic statutory construction, the precise mandates of the MRRA should be followed instead of any general principles derived from the laws of bankruptcy, inasmuch as “a more specific statute will be given precedence over a more general one,” Busic v. United States, 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980).
Accordingly, we hold that the district court’s order in this case, authorizing Ward to conduct interim operation of the Morris-town Railroad, may not be sanctioned under section 77 of the Bankruptcy Act.
Ill
For the above-expressed reasons, the order of the district court will be vacated, and the matter will be remanded to that court for proceedings consistent with this opinion.[10] To prevent temporary suspension of operations on the Morristown Railroad as a result of our decision today, we have directed that the mandate not issue for ten days, but authorize the district court, in the interim, to take those steps necessary to comply, with this opinion and to ensure the continued operation of the Railroad.

. The Morristown & Erie Railroad Company, debtor in this proceeding, is not to be confused with appellee Morristown & Erie Railway, Inc., the organization associated with the Ward purchase application discussed infra.

. 11 U.S.C. § 205 (repealed 1978). Although the Bankruptcy Act was replaced by the Bankruptcy Code, effective October 1, 1979, the provisions of the Act govern the present appeal, inasmuch as this case was commenced under that statute. See Pub.L.95-598, Title IV, § 403(a), 92 Stat. 2549, 2683 (1978).

. In no sense can such a course of action on the part of the district court be considered a usurpation of the role of the ICC. Regardless of which party is designated interim operator by the reorganization court, the ICC always retains the statutory authority to disapprove the interim operator’s pending application.

. In In re Chicago, Milwaukee, St Paul & Pac. R. R. Co., 641 F.2d 482 (7th Cir. 1981), the court approved a district court’s order granting preliminary approval and interim operating rights to Burlington Northern, despite the objections of the Montana Department of Agriculture, which opposed the preliminary sale to Burlington and sought to purchase a portion of the lines for itself. The precise issue raised on appeal there — whether the authorization of a preliminary sale under the MRRA by a district court was valid inasmuch as the designated interim operator had not yet filed an application for purchase with the ICC — is not on point here. Nonetheless, it is instructive to observe that the district judge gave preliminary approval to Burlington’s purchase request before permitting that party to operate interim service on the discarded Milwaukee lines. In the case at bar, however, the district court did not grant such preliminary approval before proceeding to endorse Ward’s interim operating request.

. This reading of § 5(b)(3) was adopted by the Seventh Circuit in a recent reorganization case involving the Milwaukee Railroad:
Congress was careful under Section 5(b)(3) only to permit another rail carrier to operate interim service. If Congress had desired non-carriers to operate interim service, it could have so indicated. In the absence of such an expression, we interpret Section 5(b) as applicable only to existing carriers, and thus inapplicable to non-carriers.
In re Chicago, Milwaukee, St. Paul & Pac. R. R. Co., 658 F.2d 1149, 1171-72 (7th Cir. 1981).

. Mandelbaum relies on Railway Labor Executives’ Ass’n v. Gibbons, - U.S. -, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982), in which the Supreme Court struck down the Rock Island Transition and Employee Assistance Act— which dealt solely with the bankruptcy status of one railroad — as an unconstitutional nonuniform bankruptcy law. The Court held that “the uniformity requirement of the [Bankruptcy] Clause prohibits Congress from enacting bankruptcy laws that specifically apply to the affairs of only one named debtor.” Id. at -, 102 S.Ct. at 1177.

. In Gibbons, see note 6 supra, the Supreme Court explicitly declined to decide whether those sections of the MRRA which apply only to one railroad pass constitutional muster under the Bankruptcy Clause. - U.S. at -n.11, 102 S.Ct. at 1177 n.11.

. The United States, which filed a brief as Intervenor in this case, argues that § 17(b) of the MRRA, rather than constituting an act on the subject of bankruptcy, in fact represents an exercise of congressional authority under the commerce clause. The United States also argues that § 17(b) is distinguishable in scope and intent from the statute invalidated by the Supreme Court in Gibbons, see note 6 supra. We express no opinion, of course, as to either of these contentions. Courts are admonished “not to pass on questions of constitutionality ... unless such adjudication is unavoidable.” Spector Motor Co. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944).

. Appellees have pointed to no case, and we are not aware of any, explicitly authorizing a district court to lease rail property of a debtor pending reorganization. Reliance by Ward on In re Penn Cent. Transp. Co., 370 F.Supp. 486, 487 (E.D.Pa.1974), is misplaced, inasmuch as there the trustee leased non-operating assets of the estate. In re Penn Cent. Transp. Co., 391 F.Supp. 475 (E.D.Pa.1975), also involved the trustee’s authority with respect to the management and disposition of non-operating assets. While the district court in In re Reading Co., 361 F.Supp. 1351 (E.D.Pa.1973), approved the sublease of two passenger rail services, it did so without discussion, see id. at 1353 n.2, and the issue was not raised on appeal.

. The appellees also contend that Mandelbaum should be estopped from advancing the above arguments to this Court, because, before the district court, Mandelbaum sought to receive the interim operating permit that ultimately was awarded to the Ward group. Appellees complain that “Mandelbaum invoked and embraced the very judicial authority for its own expected benefit that it now contends is non-existent.” Brief for Appellee Morristown & Erie Railway, Inc. at 33. We find no reason, however, to disbelieve appellant’s explanation that, at the time it applied for interim rights, it was not aware of the various legal problems relating to the MRRA that were raised by the district court’s action. Reply Brief for Appellant at 21. We note, moreover, that all of the legal and constitutional issues pressed by Mandelbaum on this appeal were presented to and argued before the district court on Mandelbaum’s January 6, 1982 Motion to Alter or Amend the Order. At any rate, we would hesitate to invoke doctrines of judicial estoppel where, as here, the district court’s failure to comply with the procedural requirements set forth in the applicable federal statute implicates not only the relevant interests of the litigating parties, but also the public’s interest in promoting the policies underlying the statute.